**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| | : | |
| NIKA'RAET BEY, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 06-1180 |
| | : | |
| v. | : | **OPINION** |
| | : | |
| CHARLES R. GARCIA, JR., | : | |
| JENEY & JENEY L.L.C., | : | |
| JO-ANNE B. SPATOLA J.S.C., | : | |
| MELVIN S. WHITKEN J.S.C., | : | |
| JANE V. HARPER D.C.J., | : | |
| STATE OF NORTH CAROLINA | : | |
| | : | |
| Defendants. | : | |
| | : | |

**KATHARINE S. HAYDEN, U.S.D.J.**

Pro se plaintiff, Nika'Raet Bey, has filed for special relief in relation to the complaint she has filed, which in the main seeks custody of her son and also makes allegations that during the official proceedings that ultimately awarded custody of her Netjere to the child's father, violations of her federal civil and constitutional rights occurred.  She invokes 42 U.S.C. 1981, 1983, 1985, and 1986, as well as the First, Fourth, and Fifth Amendments to the U.S. Constitution.  Complaint at ¶e, page 3.

The relief sought is that the action be designated *in forma pauperis*, and that *pro bono* counsel be appointed.  As a consequence, the Court must analyze the pleadings that the plaintiff has filed to determine if they are frivolous or malicious, fail to state a claim upon which relief may be granted, or seek monetary relief from a defendant or defendants immune from such relief.

In the event the Court determines one or more of these deficiencies exists, then, under 28 U.S.C. §1915, the lawsuit is subject to dismissal by the Court *sua sponte*.

## I.   BACKGROUND

Bey has asserted claims against the following persons and entities:  Charles R. Garcia, Jr. ("Garcia"), Netjere's father; Jeney & Jeney, L.L.C. ("Jeney & Jeney"), the law firm representing Garcia at some point in the proceedings before the family court; New Jersey State court judges Jo-Anne B. Spatola ("Judge Spatola") and Melvin S. Whitken ("Judge Whitken"); Jane V. Harper, U.S.D.J.  ("Judge Harper"), who sits in the District of North Carolina; and the State of North Carolina.

The plaintiff's papers indicate that this lawsuit arises out of her dissatisfaction with the outcome of State court custody hearings that determined whether she or Netjere Bey's father, Charles Garcia, would be granted custody of the boy, who was born in October, 2001.  These proceedings were held in the Family Part of New Jersey Superior Court, and ultimately enforcement of Orders relating to the proceedings was sought in North Carolina.  Specifically, it appears that in June, 2002, Garcia petitioned for custody.  (The plaintiff's document entitled Affidavit of Facts That Led to This Action ("Pl.'s Aff.") at ¶1).  On or about July 1, 2002, the plaintiff states that she filed for an Order of Protection from Garcia, and pursuant to a hearing held on July 23, 2002,  Judge Karen M. Cassidy issued a "No Contact" Order.  (<u>Id.</u> at ¶2).  The plaintiff asserts that the Judge ordered both parties to complete assessments of parental fitness. The plaintiff states she complied, and that when Garcia failed to comply with the Order, the plaintiff reported his actions to the Plainfield police in or around August/September 2002.   (<u>Id.</u>)

The complaint avers that on or about September 25, 2002, the plaintiff and Garcia were

again before Judge Cassidy, who issued an Order on September 26, 2002, granting the plaintiff's request for child support of $500.00 a month, and also restrained Garcia from contact with the plaintiff until he demonstrated that he was not a danger to the child.  (Id. at ¶3).

In December 2002, Garcia again petitioned the court for custody, and in January 2003, the matter came before Judge Melvin S. Whitken.   Apparently, this judge ruled against the plaintiff. The plaintiff complains that Judge Whitken "was cruel and had unusual behavior and dismissed her concerns without lawful basis."(Id. at ¶5).

The plaintiff goes on to aver that on or about March 18, 2003, a temporary restraining order was issued against Garcia for violating the "No Contact" Order of September 26, 2002. (Id. at ¶6).  She states that on April 7, 2003,  Judge Joseph Donahue, J.S.C. entered a final restraining order, which directed that Garcia contact the plaintiff about Netjere in a "non-harassing" way.  (Id.).  Then, on or about June 11, 2003, the plaintiff received a letter from the law firm of Jeney & Jeney, L.L.C., notifying her that it would be representing Garcia in the child custody proceedings.  (Id. at ¶7).

The plaintiff claims that on June 19, 2003, she contacted the Plainfield police, charging that Garcia was "assaulting and harassing her."  She states that the police refused to intervene on her behalf  "by the request of the Attorneys of the defendant."  (Id. at ¶8).  The plaintiff sought emergent relief from the State court, and asserts that Judge Whitken instructed his law clerk to deny her application.  (Id. at ¶9).  The plaintiff claims that it was due to this decision that she chose to move to North Carolina.  (Id..)  Although not specified, it appears that the plaintiff left the jurisdiction with Netjere and her other child, actions characterized in State court records as "absconding" with the little boy.   The Court gleans from the pleadings that through official

action in North Carolina, where the plaintiff took Netjere, he was returned to Garcia. The plaintiff's submissions state that she does not know where Garcia presently resides, and while again the pleadings are not specific, apparently Netjere resides with Garcia in this unknown place.

The foregoing background appears in the "Affidavit of Facts That Led to this Action." The complaint charges the family court judges in New Jersey who ruled against the plaintiff, Garcia, the lawyers representing him, North Carolina authorities (including judicial personnel), and New Jersey law enforcement personnel who enforced the Orders of the defendant judges, with numerous violations of state and federal laws. A careful reading of the complaint establishes that the federal claims are asserted within the framework of the family courts' actions – their orders, efforts to obtain them, and efforts to enforce them – and that the relief sought is focused on getting back custody of Netjere.

## II.      STANDARDS FOR A SUA SPONTE DISMISSAL

In 1892, the Act of July 20, 1892 established Public Law Number 209, the predecessor to 28 U.S.C. § 1915. See Pub.L.No.209, 27 Stat. 252. "Under this statute an indigent individual may initiate a claim or defend his life or property, without an obligation to pay the court costs that most parties must bear, and in some instances with the assistance of court-appointed counsel." McTeague v. Sosnowski, 617 F.2d 1016, 1019 (3d Cir. 1980). The statute states, in relevant part:

> **(a)(1)** Subject to subsection (b), any court of the United States may authorize the commencement, prosecution or defense of any suit, action or proceeding, civil or criminal, or appeal therein, without prepayment of fees or security therefor, by a person who submits an affidavit that includes a statement of all assets such prisoner possesses that the person is unable to pay such fees or give security

therefor. Such affidavit shall state the nature of the action, defense or appeal and affiant's belief that the person is entitled to redress.

(**d**) The officers of the court shall issue and serve all process, and perform all duties in such cases. Witnesses shall attend as in other cases, and the same remedies shall be available as are provided for by law in other cases.

28 U.S.C. § 1915(a)(1); (d).  In this way, Section 1915 is a gateway through which in

forma pauperis litigants may bring suit.  Id.

Because Congress became concerned that its "removal of the cost barrier might result in a tidal wave of frivolous or malicious motions filed by persons who gave no pause before crossing the threshold of the courthouse door," McTeague, 617 F.2d at 1019, safeguards were incorporated.  To address the potential problems of court congestion and a financial burden on the public, see Fletcher v. Young, 222 F.2d 222, 224 (4th Cir. 1955),  Congress included a provision permitting the early dismissal of some claims, including dismissal by the court acting sua sponte.  The pertinent language provides:

Notwithstanding any filing fee, or any portion thereof, that may have been paid, *the court shall dismiss the case at any time* if the court determines that– . . .

(**B**) the action or appeal--

(**i**) is frivolous or malicious;

(**ii**) fails to state a claim on which relief may be granted; or

(**iii**) seeks monetary relief against a defendant who is immune from such relief.

28 U.S.C. § 1915(e) (emphasis added).

The Court construes a *pro se* complaint liberally, and must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." Haines v. Kerner, 404 U.S. 519, 520-21 (1972); United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992); Morse v. Lower Merion School

5

Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The Court need not, however, credit a plaintiff's "bald assertions" or "legal conclusions."  Id.

A complaint may be dismissed as frivolous if it "lacks an arguable basis either in law or in fact."  Neitzke v. Williams, 490 U.S. 319, 325 (1989) (interpreting the predecessor of § 1915(e)(2), the former § 1915(d)).  The standard for evaluating whether a complaint is "frivolous" is an objective one.  Deutsch v. United States, 67 F.3d 1080, 1086-87 (3d Cir. 1995).

A complaint may be dismissed for failure to state a claim when "'the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Haines, 404 U.S. at 521 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)); Milhouse v. Carlson, 652 F.2d 371, 373 (3d Cir. 1981).

Where a complaint can be remedied by an amendment, a district court may not dismiss the complaint with prejudice, but must permit the amendment.  Denton v. Hernandez, 504 U.S. 25, 34 (1992); Grayson v. Mayview State Hospital, 293 F.3d 103, 108 (3d Cir. 2002) (dismissal pursuant to 28 U.S.C. § 1915(e)(2)); Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000) (dismissal pursuant to 42 U.S.C. § 1997e(c)(1)); Urrutia v. Harrisburg County Police Dept., 91 F.3d 451, 453 (3d Cir. 1996).

The Court turns to the allegations and demands for relief in this plaintiff's lawsuit.  In analyzing the sufficiency of the complaint under Section 1915, the Court notes that the individual counts are denominated after the demands for relief are set forth.  Because the Court is satisfied that plaintiff has filed in federal court to get custody of her child, it will first focus on the demands for relief, and then examine the claims asserted against these defendants.

III.    **CHILD CUSTODY DEMANDS FOR RELIEF**

Five out of the six demands for relief set forth in the complaint relate specifically to child custody.[1]  Specifically, the complaint asks the Court for:

a.    Injunctive relief Temporary Restraining Order, awarding plaintiff sole, legal, and physical custody of the Child.

b.    Compelling defendant, Charles R. Garcia Jr. to pay fair and reasonable Child support.

c.    Compelling defendant, Charles R. Garcia Jr. to undergo a risk assessment, mental health evaluation and testing for drugs and what ever the Court deems in the Child's best interests, in order to evaluate his fitness to visit with the Child in an unsupervised setting.

d.    Providing defendant visitation with the Child in a supervised environment Until such time as the court is satisfied that he does not pose a risk to the health, safety and welfare of the Child. ...

f.    Granting such further and additional relief as the court may deem just and equitable under the circumstances, and in the Child's best interests.

But a federal court cannot provide such relief.  The U.S. Supreme Court and the Third Circuit have long held that child custody claims fall squarely within the ambit of domestic relations:

Traditionally, it has been the policy of federal courts to avoid assumption of jurisdiction in this species of litigation.  'The whole subject of domestic relations ... belongs to the laws of the states and not to the laws of the United States.'  Indeed, this court has explicitly held there is no federal diversity jurisdiction in a domestic relations case involving a child.

Magaziner v. Montemuro, 468 F.2d 782 (3d Cir. 1972) (citing In re Burrus, 136 U.S. 586, 593-94

---

[1] The sixth demand includes several federal claims, and is addressed below.  This demand, under letter (e), states, "Compelling the all defendants to pay plaintiff compensatory damages, punitive damages and civil damages in violation of Acts of the Executive branch of this Government and laws thereof specifically 42 U.S.C. 1981, 1983, 1985, 1986, 1st, 4th, & 5th Amendment."  (Complaint, at ¶ e).

(1890) (finding that the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States, and not to the laws of the United States).

In a case decided in 1975, the Third Circuit reiterated the limitations on its jurisdiction, again relying on established United States Supreme Court holdings:

[F]ederal courts do not have jurisdiction in domestic relations suits except where necessary to the effectuation of prior state court judgments involving the same matters or where jurisdiction lies by dint of the participation and review of territorial courts.

Solomon v. Solomon, 516 F.2d 1018, 1024 (1975) (citing Barber v. Barber, 62 U.S. (21 How.) 582 (1859); Williams v. North Carolina, 325 U.S. 226, 237 (1945) ( "... in [the] federal system, ... [the] regulation of domestic relations cases has been left with the States and not given to the national authority."); De La Rama v. De La Rama, 201 U.S. 303 (1906); Simms v. Simms, 175 U.S. 162 (1899)).  This curb on federal authority in the arena of domestic relations "preserves the sanctity of state court judgments and protects against confusing and complicated piecemeal litigation."  Solomon, 516 F.2d at 1026.

As a consequence of established precedent that is specific and clear, this Court lacks jurisdiction to grant the requested relief insofar as Netjere's living arrangements, support, contact with his father, and general welfare are concerned.  Any related claims fail to state a claim upon which relief can be granted and under Section 1915, and are dismissed.

## IV.    FEDERAL CLAIMS

## A.    FEDERAL CLAIMS AGAINST JUDGES

## 1.    Judicial Immunity

The plaintiff has listed the following counts in her complaint: "Count One: Violation of

8

Constitutional Rights;" "Count Two: Breach of Duty to Protect and Discharge Office;" "Count Three: Breach of Administrative Dutys;" "Count Four: Unlawful Search and Seizure;" "Count Five: Violation of Oath and Obligation;" "Count Six: Denial of Due Process of the Law of the Land;" "Count Seven: Misnomer and Violation of Executive Mandate."

These counts are set forth following the demands for relief. The actions they are related to are more fully described in the "Affidavit of Facts That Led to this Action," annexed to the complaint. Taken together, these pleadings appear to cycle plaintiff's dissatisfaction with certain judicial decisions through a variety of federal constitutional and civil rights causes of action, as well as creating some (such as "Violation of Oath and Obligation"). But whether analyzed count by count or in the aggregate, the majority of these claims relate to the official duties of the judges who made custody rulings.

It is a well-established principle that judges are absolutely immune from suits for damages when they act in a judicial capacity. See Stump v. Sparkman, 435 U.S. 349, 356-57 (1978). See also Bradley v. Fisher, 13 Wall. 335, 347, 20 L.Ed. 646 (1872) (stating that judicial immunity was "the settled doctrine of the English courts for many centuries, and has never been denied, that we are aware of, in the courts of this country."). In fact, "[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction." Pierson v. Ray, 386 U.S. 547, 553-54 (1967) (citing Bradley v. Fisher, 13 Wall. 335 (1872)).

The Supreme Court has described the rationale behind the immunity doctrine as follows:

[T]he nature of the adjudicative function requires a judge frequently to disappoint some of the most intense and ungovernable desires that people can have ... [T]his

9

is the principal characteristic that adjudication has in common with legislation and with criminal prosecution, which are the two other areas in which absolute immunity has most generously been provided. If judges were personally liable for erroneous decisions, the resulting avalanche of suits, most of them frivolous but vexatious, would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits. The resulting timidity would be hard to detect or control, and it would manifestly detract from independent and impartial adjudication.

Forrester v. White, 484 U.S. 219, 226-27 (1988) (citations omitted).  Judicial immunity allows

the courts to protect the finality of judgments, discourage inappropriate collateral attacks, and

ensure judicial independence by insulating judges from actions initiated by disgruntled litigants.

Id., at 348.  As the Supreme Court stated:

It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decisionmaking but to intimidation.

Pierson v. Ray, 386 U.S. 547, 553-54 (1967).  Immunity applies even when the judge is accused

of acting maliciously and corruptly, because it is thought to benefit the public, "whose interest it

is that the judges should be at liberty to exercise their functions with independence and without

fear of consequences."  Scott v. Stansfield, L.R. 3 Ex. 220, 223 (1868).

In the past few decades, the courts have expanded on this immunity, finding that it also

applies to Executive Branch officials who perform quasi-judicial functions or prosecutorial

functions that are "intimately associated with the judicial phase of the criminal process."  Imbler

v. Pachtman, 424 U.S. 409, 430 (1976).  See also Butz v. Economou, 438 U.S. 478, 513-514

(1978).  The courts have found that this expansion is necessary to allow even advocates and

witnesses to be free from harassment or intimidation.  See Briscoe v. LaHue, 460 U.S. 325 (1983); Butz, 438 U.S. at 2913.

In order to determine whether judicial immunity attaches, the court must engage in a two-part inquiry. The first prong is to determine whether the suit alleges an action within the judge's judicial functions.  "[T]he factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." Gallas v. Supreme Court of Pennsylvania, 211 F.3d 760, 768 -770 (3d Cir. 2000) (citing Stump v. Sparkman, 435 U.S. 349, 362 (1978)).

As to the second prong, the Court must distinguish between acts in the "clear absence of all jurisdiction," which do not enjoy the protection of absolute immunity, and acts that are merely in "excess of jurisdiction," which do enjoy that protection.  Id. (citing Stump, 435 U.S. at 356 n. 6).  In Stump, the Court stated:

> A distinction must be here observed between excess of jurisdiction and the clear absence of all jurisdiction over the subject-matter. Where there is clearly no jurisdiction over the subject-matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. But where jurisdiction over the subject-matter is invested by law in the judge, or in the court which he holds, the manner and extent in which the jurisdiction shall be exercised are generally as much questions for his determination as any other questions involved in the case, although upon the correctness of his determination in these particulars the validity of his judgments may depend.

Stump, 435 U.S. at 356 n. 6 (citation omitted).

11

2.      **Application of Judicial Immunity to This Case**

Here, the plaintiff is complaining of judicial acts – memorialized in orders – undertaken by the judges who ruled against her in her contentious litigation with her son's father. Significantly, plaintiff does not sue the judges who ruled in her favor.  But her dissatisfaction with rulings and attacks on those jurists who made them do not change the nature of the actions she complains of, which were clearly judicial in function and in accord with the expectations, if not the liking, of the parties affected.  There is no way to read the plaintiff's pleadings other than to find that the New Jersey judges whose rulings she attacks were family part judges acting within their jurisdiction.  As for the plaintiff's claims relating to District Judge Harper of the District of North Carolina, they relate to the plaintiff's eviction from her apartment, which she states was "at the direction of Judge Jane V. Harper."  (Affidavit of Facts That Led to this Action, at ¶ 11).   On its face, the complaint is clearly directed toward a judicial act.

Although the plaintiff asserts that the judges acted maliciously, unconstitutionally, failed in their "administrative duties," and although she makes broadside attacks upon their integrity – classic "bald assertions" that subject her pleadings to dismissal under the traditional standards of review of sufficiency of a complaint –  the long and short of it is that the plaintiff focuses only on judicial rulings that she does not like.  This cherry-picking is revealing.  And the requirement that this Court dismiss these claims based on the defendant jurists' absolute immunity is evident.

The Court dismisses all claims made against the judicial defendants for failure to state a claim upon which relief can be granted.

**B.      FEDERAL CLAIMS AGAINST STATE OF NORTH CAROLINA**

The Eleventh Amendment to the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit
> in law or equity, commenced or prosecuted against one of the United States by
> citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. AMEND. XI.

In general, a suit by private parties seeking to impose a liability which must be paid from public funds in a state treasury is barred from federal court by the Eleventh Amendment, unless Eleventh Amendment immunity is waived by the State itself or by federal statute.  See, e.g., Edelman v. Jordan, 415 U.S. 651, 663 (1974).  The Eleventh Amendment protects each State and its agencies and departments from suit in federal court regardless of the type of relief sought. Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 100 (1984).  Absent consent by a State, the Eleventh Amendment bars federal court suits for money damages against State officers in their official capacities.  See Kentucky v. Graham, 473 U.S. 159, 169 (1985).

Title 28 Sections 1915(e)(2)(B)(iii) and 1915A(b)(2) require this Court to dismiss this action if it "seeks monetary relief from a defendant who is immune from such relief."  Although the plaintiff names the State of North Carolina as a defendant, she makes no specific claim against the State, its agencies or departments, or its officers.  After a thorough reading of the complaint and the accompanying papers, the Court cannot determine which claims, if any, the plaintiff seeks to bring against the State.  Even if claims were properly made, the State defendant enjoys Eleventh Amendment immunity;  were a waiver available, the absence of any basis for a claim or articulation of a theory of wrongdoing makes any analysis along those lines impossible. The plaintiff's claims against North Carolina lack any basis in law or fact, are barred even had

13

they some substance, and are dismissed.

## C.      FEDERAL CLAIMS AGAINST JENEY & JENEY AND GARCIA

The plaintiff has asserted additional federal claims, but has failed to articulate against

whom they are asserted.   Nonetheless, the Court undertakes an analysis of the specified federal

statute to determine if the named defendants may properly be sued and permit that portion of the

complaint to survive.   In doing so, the Court again applies the required analysis under Section

1915 to determine if they withstand scrutiny.

## 1.      Violations under 42 U.S.C. § 1981 and § 1983

## a.      42 U.S.C. §1981 states:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State
and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and
equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by
white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and
exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making,
performance, modification, and termination of contracts, and the enjoyment of all benefits,
privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental
discrimination and impairment under color of State law.

42 U.S.C. § 1981.  The plain language of the statute demonstrates that Section 1981 "on its face

relates primarily to racial discrimination in the making and enforcement of contracts."  Goodman

v. Lukens Steel Co., 777 F.2d 113, 134-35 (3d Cir. 1985) (citing Johnson v. Railway Express,

421 U.S. 454, 459 (1975)).  See also Koorn v. Lacey Tp., 2003 WL 22366923, *6 (3d Cir. 2003).

Also as evidenced by the language of the Section, a plaintiff may press an allegation of

intentional racial discrimination under Section 1981 only when State action is present.

Goodman, 777 F.2d at 120.

**b.      42 U.S.C. § 1983**

42 U.S.C. § 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress, except that in any action brought
> against a judicial officer for an act or omission taken in such officer's judicial
> capacity, injunctive relief shall not be granted unless a declaratory decree was
> violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  Section 1983 provides a private cause of action against State actors for a

deprivation of rights protected by a federal statute or the United States Constitution.  As such, a

plaintiff must demonstrate: (1) a violation of a right secured by the Constitution or the laws of

the United States; and (2) that the deprivation was committed by a person acting under the color

of State law.  Abraham v. Raso, 183 F.3d 279, 287 (3d Cir.1999).

**c.      Application to Defendants Garcia and Jeney & Jeney**

In considering both of the claims of 42 U.S.C. § 1981 and § 1983 as alleged against

Garcia and Jeney & Jeney, the Court finds the plaintiff has failed to state a claim upon which

relief may be granted.  Both Section 1981 and Section 1983 provide for a means to bring suit

against State officers, acting "under color of State law," for engaging in intentional racial

discrimination or depriving of a Constitutional or federal right.  42 U.S.C. § 1981;  Goodman,

15

777 F.2d at 120 (applying to 42 U.S.C. § 1981); 42 U.S.C. § 1983; Abraham, 183 F.3d 287

(applying to 42 U.S.C. § 1983).  Garcia is a private citizen, and the law firm is a private

professional practice, on the face of these pleadings, whose actions were the representation of

Garcia as a private litigant.  Because neither Garcia nor Jeney & Jeney are State actors, there is

no basis to delve any further into the conduct alleged.

Because these statutes do not offer relief against these defendants, the plaintiff has stated

a claim for which there exists no relief pursuant to 28 U.S.C. § 1915(e), and the Court dismisses

the claims asserted under 42 U.S.C. § 1981 and 42 U.S.C. § 1983 against Garcia and his lawyers,

Jeney & Jeney.

**2.      42 U.S.C. § 1985**

42 U. S. C. §1985 provides relief thus:

(1) Preventing officer from performing duties
If two or more persons in any State or Territory conspire to prevent, by
force, intimidation, or threat, any person from accepting or holding any
office, trust, or place of confidence under the United States, or from
discharging any duties thereof; or to induce by like means any officer of the
United States to leave any State, district, or place, where his duties as an
officer are required to be performed, or to injure him in his person or
property on account of his lawful discharge of the duties of his office, or
while engaged in the lawful discharge thereof, or to injure his property so as
to molest, interrupt, hinder, or impede him in the discharge of his official
duties;

(2) Obstructing justice; intimidating party, witness, or juror
If two or more persons in any State or Territory conspire to deter, by force,
intimidation, or threat, any party or witness in any court of the United States
from attending such court, or from testifying to any matter pending therein,
freely, fully, and truthfully, or to injure such party or witness in his person or
property on account of his having so attended or testified, or to influence the
verdict, presentment, or indictment of any grand or petit juror in any such
court, or to injure such juror in his person or property on account of any
verdict, presentment, or indictment lawfully assented to by him, or of his
being or having been such juror; or if two or more persons conspire for the

16

purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

(3) Depriving persons of rights or privileges
If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.SC. §1985.

Generally, these provisions authorize a suit for *conspiracy* to interfere with civil rights.

See 42 U.S.C. § 1985. The only reference the plaintiff makes regarding a conspiracy is when she states, in Count Two of the complaint (entitled "Breach of Duty to Protect and Discharge Office"), that "Defendants with skilled lawyers and co-conspirator judge partners has made the Plaintiffs life a living hell ..." (Complaint at Count Two). This Court is not required to peruse the complaint in order to glean what this means, or offer the plaintiff another opportunity through amendment to explain what making her life "a living hell" means.

A conspiracy charge must have content.  The essence of a conspiracy is "an agreement to commit an unlawful act."  United States v. Jimenez Recio, 537 U.S. 270, 274 (U.S. 2003); Iannelli v. United States, 420 U.S. 770, 777 (1975); United States v. Shabani, 513 U.S. 10, 16 (1994); Braverman v. United States, 317 U.S. 49, 53 (1942).  In complaining these defendants conspired to make her life a living hell, plaintiff is hurling an inartful and unspecified bald, subjective, idiomatic description that fails to be informative, let alone raise a legal, cognizable claim.  As such, this claim is "frivolous," under 28 U.S.C. § 1915, as it does not allow for any set of facts to support the claim that would entitle the plaintiff to relief.  28 U.S.C. § 1915(e).  See also Haines, 404 U.S. at 521 (citations omitted); Milhouse v. Carlson, 652 F.2d 371, 373 (3d Cir. 1981).  This Court dismisses the plaintiff's allegations of a conspiracy.

### D.      REMAINING CONSTITUTIONAL CLAIMS

In asserting constitutional violations under the First, Fourth, and Fifth Amendments against the judges who ruled against her, the plaintiff justifies her demands for return of her child, support from his father, and other relief directly related to Netjere's welfare and her parental rights to raise him.  Even though the judges' actions could be deemed undertaken "under color of law," and assuming that absolute immunity would not lie for purposes of examining the claims, the Court is satisfied that the broadside attacks in this complaint and the selectivity with which the plaintiff has launched them, choosing only those judges whose rulings she disagrees with, support a finding that the alleged constitutional violations are frivolous.

### V.      CONCLUSION

In the foregoing discussion, the Court has not remarked on other serious deficiencies and

18

anomalies in the plaintiff's papers. The length of time since the challenged rulings were rendered, the plaintiff's vagueness with regard to the proceedings of the State court, and her failure to provide an address for the child's father and, presumably, the child, all raise serious concerns about this lawsuit even if it had raised colorable claims.   Taking the plaintiff at her word – that she is bitter about judicial and law enforcement officers who have deprived her of her custodial status – the Court is constrained to point out that the plaintiff's remedies lie with the State court with jurisdiction over the boy's welfare, jurisdiction that arises out of the boy's residence.

Noting the absence from the recital of the plaintiff's battles in the courts of any mention of an application for appellate review or petition to a family judge in the state/county where Netjere resides, the Court has examined public records of the State courts, and learned that on February 21, 2006, both the plaintiff and Garcia were before Judge Spatola in Union County, who held hearings and issued further orders of custody in Garcia's favor.  Specifically, Judge Spatola found that all provisions of that court's March 16, 2005 order should remain in effect, with the child remaining in Garcia's custody.  Judge Spatola also found that Nika'Raet Bey still had not complied with the previous orders of the court.  In addition, State court records reflect the plaintiff was remarried in April of 2004, and that she refused to reveal her spouse's name, address, social security number, or date of birth to the Judge.  None of this activity in the State courts was included in plaintiff's representations in her pleadings before this Court.  The plaintiff is thus revealed as an active, current litigant in the State courts, who has presented to this Court a less than complete picture of the litigation affecting her son.  Along with this effort to get the federal courts to upset State proceedings, plaintiff seeks special relief from court fees and appointment of free legal representation.  This raises forum shopping to a new level.

19

The remedy of amendment of the complaint will do nothing to cure the deficiencies presented here because the core of the complaint is about the custody of Netjere.  Some of the claims are framed under federal civil rights laws, but are barred by the absolute judicial immunity granted to judges.  The balance of the allegations and claims based upon them are either frivolous or lack a basis for relief in this Court.  This complaint, in its entirety, is dismissed.  As a consequence, *in forma pauperis* status and the appointment of legal counsel *pro bono* are denied.

An appropriate order will be entered.


Dated:   May 2, 2006

s/ Katharine S. Hayden

_____ Katharine S. Hayden, U.S.D.J.